May it please the Court and Counsel, I'm Janet Clapstead. I'm appearing on behalf of Appellant Palmateer. I have a couple housekeeping matters before we commence argument. First, I did want to make mention of the fact that I provided the Court a memo of supplemental authority showing that the Buckley v. Terhune case cited in our brief has been taken for inbound purview. So, I advise in the Court of that. And as a secondary matter, I did want to reserve five minutes or the balance of my time. You may do so, Counsel. Just watch your clock. Thank you very much. As can be seen from this case, it is, of course, a state's appeal from the district court's vacation of a set of 20-year-old rape convictions. It is a hotly contested case in a factual matter. It was contested not fewer than three different times in state courts and then again in the federal court system. And it's not so much the age of the case or the fact that this fellow did so many different rapes that is the legal issue before you is that the state appellant contends that the district court, quite frankly, misapplied the now-deferential standards of ADPA. ADPA, of course, has changed the face of federal habeas corpus law in any number of ways. There's no issue that ADPA applies, is there? There's none whatsoever. Notwithstanding this was a 20-year-old. No, there were a series of appeals in the state system, but the federal petition was filed after the commencement date of ADPA. But let me ask you a question with reference to the deference owed under ADPA. As far as I can determine from the record, there were no factual findings in any Oregon state court that adopt a specific motivation for Weaver's guilty plea. On what are we supposed to base our deference under ADPA? Well, actually, I don't know that I would go so far as that, and I know my opposing counsel takes that position that there are no explicit factual findings along those lines. What those various state courts held along the series of challenges are as follows. That in the first hearing, of course, the judge to whom the request to withdraw the plea was presented found after hearing the evidence that this was a Johnny Come Lately claim, that it was hard to believe, that he viewed the plea as dynamically what happens when the defendant, now petitioner, got down to the Oregon State Hospital and found that he was not going to receive the type of treatment program that he had best preferred, that that's when he decided to withdraw his plea, and that it was not then the representation but his own personal motivations that made that change of heart. But didn't the court misstate the facts when he said it was a Johnny Come Lately claim? No, that's incorrect. And you can see that by the admissions of the defendant's petitioner's own counsel when he got to the next stage of proceedings. The petitioner would have you believe that, well, it's not conceivably possible that when the criminal defendant got to the state hospital, he had access to these private psychiatric courts. When they go to the very next court hearing, Mr. Clancy, who then represented him after change of counsel, told Judge Jones that that's exactly what happened, that he got down to the state hospital, that he spoke to the doctors, and the doctors told him what was in those reports. And so if the contention is that Judge Gilroy's analysis was incorrect as a matter of timing, first, Judge Gilroy, of course, would have a vast amount of experience with how a case like this is processed, precedence-wise, and when people go to the OSH. Second, I think the record as a whole shows that petitioner's own counsel admitted that that's exactly what had happened, that that's when the change of heart occurred and not before. So that would be the first finding of fact, that the state contends is entitled to a deference. The second series of findings the state contends are entitled to deference is the second hearing with Judge Jones. And again, on the very same issues raised later here in post-conviction court, on the very same issues that that court took into account the same testimony and additional testimony by the defense experts, and found that it was particularly persuaded by the attorney's statement that it was defendant who directed him that he wanted to plead guilty, he didn't want to contest it, he wanted the whole thing dropped. And he found that to be persuasive. And I think that's a credibility finding that the nature of the motives for the change of heart were precipitated by defendants, petitioner's own views of not wanting to hurt his family, something he'd expressed to at least four different psychiatric treatment providers throughout. So that would be the second factual finding the state contends is entitled to a deference. The third one, of course, is after the far more lengthy hearings in state post-conviction court in the early 90s. And at that time, the state post-conviction court found in its factual findings, not in its conclusions of law, but in its factual findings, that it failed to show that his plea was induced by ineffective representation. And that is a finding that is not only entitled a finding of fact, but it is reflected also in the letter of opinion of that court, which says, I find the very first judge's reasoning persuasive. It is not a rubber stamp decision, as my opponent would have this court believe. That court, in its letter of opinion, the post-conviction court, gave some thoughtful commentary about some of the defense experts. These other defense attorneys were some of the most excellent attorneys that could be presented in a court system, one of them now being a judge. And yet, nevertheless, neither those witnesses nor even the secretary who that judge applauded for appearance were privy to any of the direct advice between the person who pled guilty and Mr. Chabot. None of them were there. And as much as they can say, you should have done this, you should have done that, and there are a lot of things that we might agree that there are more things that could have been done, more psychologists that could have been contacted, but the fact of the matter is none of those people were privy to the direct conversations. And in those direct conversations, petitioner says one thing occurred. The attorney says another thing occurred. And what the attorney says occurred is, I would have taken all those cases to trial. I would have taken everyone to trial. But I did not tell this man he had to plead guilty. I did give him my best assessment that the insanity defense was not particularly supportive because of the bad results I'd received from Dr. Dixon, Dr. Paltrow, Dr. Maracle's report that he fabricated the symptoms, and that it had not a good chance to succeed. Now, what about Dr. Okulich? Is that the one? Okulich, I don't know exactly how that's pronounced. It is true that Dr. Okulich saw the petitioner for an hour or two early on. It is also true that Dr. Okulich's report says not a good deal of useful information was obtained. And if you look to Dr. Okulich's testimony, when he actually appeared at sentencing and explained himself, he said, yeah, I wanted to do some more evaluations. But that does not mean that any attorney had to go back to that physician when his report itself was so impeachable at the outset. Instead, that attorney went to Dr. Dixon, a psychiatrist, not a psychologist, and got another assessment. That attorney also had information, again, from Dr. Maracle, who was both a psychiatrist and a treatment provider up at the Health Sciences Center. And Dr. Maracle disclosed this business about this was a fabricated amnesia report, and the tests that I did would not support the defense. Now, certainly, Attorney Chabot could have picked up the phone and called Dr. Okulich again. But I can think of plenty of people on the state side that would love to take the opinion of Dr. Okulich apart knuckle by knuckle. It is incredibly impeachable. If you look at Dr. Okulich's testimony at sentencing, he says, well, I couldn't get much information from this fellow. He was crying. He was tearful. His attorney had told him not to talk to me about anything but crimes. And so I read the police reports. And it's from the police reports that I came to this conclusion that he was this sort of individual, a compulsive rapist. The second component of the validity of the insanity defense, as long as we're on that issue, is, of course, what we view as something that would provide virtually an absolute bar to the success of this proposed defense. Petitioner says here, well, there's a change of law in 1983, and personality defenses could provide a valid basis for an insanity defense. This type, this broad classification of what a personality disorder can and cannot do fails to look at the Strickland requirements that it is petitioner's obligation to prove that this is a defense that would likely succeed. It's not that he does or does not have a particular diagnosis. It is that this defense is one likely to succeed. And the state courts found that was not the case. And, again, petitioner says, well, there's no finding of that effect. And I would point you to the language of the initial judgment from Clackamas County. And at Clackamas County, once we're done with the plea withdrawal hearing, they have a full-blown sentencing hearing where several of these mental health providers testify. And the reason they do that is to determine whether this person is predisposed to be dangerous. And at the tag end of that judgment, both oral findings and the written judgment say, I find this person has a personality disorder, but it does not rise to the level of one that provide a mental disease or defect defense. And that is likely because not only the quality of the defense, that all it would show is he's what we occasionally call a lust rapist or a compulsive rapist, but the nature of the statutory exclusion says mental disease or defect under Oregon law does not include any abnormality that is manifested only by the repeated commission of criminal acts or antisocial acts. And that's what this fellow did. That's his disorder, the repeated commission of rapes. Probably the most disturbing component of the magistrate's finding later adopted by the district court was it walked through several of the evaluations by three separate state court judges culminating in the post-conviction findings. And it says this does not even appear to be a decision on the merits. And by loosing itself from the tether that this wasn't even a decision on the merits, that the magistrate and then district court go ahead and perform what is effectively a de novo review starting from scratch, the end, without giving any deference to any of the three court findings whatsoever, much less the one that says your plea was not induced by ineffective assistance. It just says this wasn't even a decision on the merits. It is not appropriate under the current state of the law for a federal court simply to superimpose its own judgment about what facts finding should be, even when review is for clear or error. A mere dispute of facts, and there were many, many, many disputes of facts in this hard-fought battle, that doesn't even rise to clear error when there's a dispute of facts. The question under AEDPA is whether, taking the facts as a whole, looking at this record, was this an unreasonable determination or a reasonable application of the Strickland Standards? And what the magistrate did is say, well, I will believe all of this half of the evidence, but none of that half of the evidence. And, of course, taking only this half of the evidence, it's logical why somebody would say, well, this person provided ineffective assistance. But it doesn't work that way. As a matter of law, federal courts cannot substitute their own judgment. That's Woodford and Lockyer. It is not a matter of clear error, as we've shown, beyond clear error. That is, no person, as an objective matter, no reasonable jurist, could come to the conclusion that this was effective representation or that petitioner was not prejudiced. AEDPA requires presumptive validity of state court judgments. It can look to see whether there are intrinsic defects in the procedure. That is, was this person not afforded a full hearing? Was he prohibited from offering any evidence? And when we have a situation where we have not one or two, but three full-blown hearings on the very same claims over and over again, I'm hard-pressed to say that there's an intrinsic defect to the process by which the state court develops its determinations that the plea was not induced by ineffective assistance and you were not prejudiced. Even, I'd like to walk through just briefly some of the issues, and there are many, so I'll try to be as helpful as I can. But there are four main issues where the magistrate and district court disagreed on whether Mr. Chabot had provided effective assistance. You briefed us very well, and I noticed you wanted to reserve five minutes for rebuttal, but feel free to go through the mechanics of it. All right. I think I'm 537 now, so I'll bump into that. Thank you for the reminder. Four issues that are really the core of the disputes. Should Mr. Chabot have challenged the lineup? Of course, there is no evidence whatsoever, and Petitioner bears the burden of proof, of showing there was no evidence about the lineup, what was conducted other than Mr. Chabot attended, rearranged some people, made people dress down, interviewed everybody along the line, but there was no showing that the identification of the lineup was tainted whatsoever. Similarly, the business about this attorney shouldn't have told him there was a possibility of probation. Well, it is or was at that time a lawful sentence under Oregon law, as strange as that may seem, and one of the two ways into the Oregon State Hospital where that petition would want to go was through a probationary sentence or through the penitentiary, and the probationary sentence is exactly what his new attorney advocated for in front of both courts. Third is, of course, the matter of the fingerprint, and there again, the petition bears the burden of showing what a reasonable investigation would have shown had it been done. There is absolute no evidence whatsoever showing whether this fingerprint did or did not identify him other than the descriptions in the record. There was no re-examination. There is no indication of anything other than what it purported to be, a positive identification of one of six prints taken from the window, and for the magistrate to determine that the fingerprint quite possibly was deficient is based on pure speculation or that it had not matched. There is no evidence whatsoever in this matter that petitions bear the burden of showing what a reasonable investigation would have shown had it been done. The closest you got to was in the second of the three state court hearings where the actual print report was offered, and counsel as to the identifications told Petitioner we could beat those identifications. We've talked a little bit about the insanity defense, so I won't go over that unless the Court has questions. But if you're down to about three and a half minutes. I'm looking. I'm watching. I'm trying to talk as fast as I can. But even if this Court were permitted to review for clear error, as if the district court didn't have a review, there's clear error that the print was deficient because there's no evidence of it. There's clear error on the finding that Chabot affirmatively advised this petition that either this or that would qualify for an insanity defense. Not even Petitioner testified to that. There's clear error that Dr. Dixon gave an unequivocally favorable diagnosis. There's clear error that Petitioner could not possibly have known what the pre-sentence doctors at the hospital would have reported. There's clear error that there was a viable challenge to the lead. There's clear error that probation is not a permissible sentence. There's clear error that the laboratory reports had not matched. Those reports were never offered. The briefs are exhaustive. I think actually counsel and I are closer together than we are apart. I think we both recognize what the standards of counsel are and agree with those. We simply contend that the district court misapplied the deferential principles of AEDPA. Thank you, counsel. You may reserve your remaining time. We'll now hear from Mr. Bornstein. Thank you, Your Honor. In demonstrating the soundness under the AEDPA of the district court's ruling, I would like to make precise citations to the record to demonstrate the ineffective assistance of counsel present in this case. This was not a situation where the defense lawyer said to his client, well, we've got some problems with this case. You might be able to present this in sanity defense, but there's these facts against us. As we see from page volume 1, ER 161, the defense lawyer informed, incorrectly informed, his client that the psychological evidence was such that it did not even rise to the level that the defense could enter a plea of insanity. He, therefore, informed his client that he had no defense available to him. Strickland ---- Is that categorical? Certainly the language that runs through many of these portions of the record suggests that it was more of a weighing, was it not? No, Your Honor. When he makes the categorical statement that the doctor's reports did not support the defense, that is, that they did not depict a mental illness, that he had to satisfy both elements of the test, which was flatly contradictory of Oregon law, as elucidated in the State v. Matthews case, he was wrong. He informed his client that accordingly he didn't or consequently did not have a defense, a mental defense that could be waged in the case. This is not simply a matter of probabilities as to success. Strickland and Hill require that the defendant's plea, in order to be constitutionally valid, has to be an informed one. It has to rest on sound and accurate information. Excuse me, counsel. What about all the other reasons that Mr. Weaver wanted to plead guilty to? The shame to his family, his embarrassment, et cetera, et cetera. And it seems to me that this case approaches the Langford v. Day case, which said under Strickland, if the defendant insists on pleading guilty, then ineffective assistance of counsel won't be found under Strickland. Your Honor, my answer to that is two parts. Number one, when a defendant expresses an inclination, a desire to consider pleading guilty, that still does not at the outset relieve counsel of the duty to provide competent legal advice as to his options. That's clearly stated in McMahon v. Richardson, Strickland, and Hill. Well, the reason I ask the question is it's a question of prejudice here. Assuming there is a duty, if you have many other reasons why he wanted to plead guilty, to me that goes to the question of prejudice. Yes, Your Honor. I'll address that. This was a defendant, as the record discloses, cared about his options. Most prominently, on one, Volume I, ER 122 to 23, at the hearing in Clackamas County on the motion to withdraw the plea, the petitioner's new lawyer asks the lawyer whose conduct is about the defenses he might be able to raise. And his response is, we talked several times then about the options he had, about the factors involved. There were questions concerning his available options and the potential sentence. That information is further developed later in that hearing, page 145, where there's discussions about the possibility of parole. And then, in information unavailable to Judge Gilroy at that hearing in 1983, at the later deposition in the post-conviction case, there was deposition testimony to a comparable effect, Volume V, ER 83 to 86. Mr. Chabot again states, I had conversations with Mr. Weaver over many periods of time, many times, concerning what his desires were and what he wanted to do. And then, very importantly, in page 84 of that same deposition, in the jail conversation, which presumably took place on the day of the plea because he had told his secretary that he didn't make enough money in the case to drive over to the jail prior to that, he said that Mr. Weaver's decision was made and that he considered all of the factors involved. Again, I'm quoting from his testimony. He then states, page 86, I went over and over with him what they meant when talking about the offers. So this was clearly a defendant not exhibiting an implacable desire to plead guilty no matter what. This was a defendant who was concerned about his options. Well, now, counsel, we are sitting as a federal court after the state has had many rounds in this litigation. We have to apply it. How do you see our standard of review with respect to precisely these factual points you're making? As the district court held, it was an objectively unreasonable on the entire record before the Court to render the conclusion that this attorney's performance satisfied the test in Strickland and in Hill. It was an objective – it was objectively unreasonable. Notwithstanding State of Oregon Court findings to the contrary? Your Honor, really there's four findings that are relevant to this case. There were other findings that involved issues we're not litigating on appeal, such as prosecutorial misconduct. There were other findings that are structural or discussed the chronology of the proceedings. There was a motion to hearing to – I mean, a motion to withdraw the plea, those kinds of things. The only ones which you'll see on page – volume 6, ER 64, are findings 3 through 7. Two of those I would first initially submit, Your Honor, are conclusions of law no different from the mixed questions of findings of fact and law that this Court said are subject to D-1 unreasonableness analysis in Lambert. Page 978 of Lambert, there's a finding – mixed finding of fact and law that the Court says is a – is subject to D-1 analysis, that the pleas were knowing voluntary intelligence. That's exactly what this Court said here, so it's a mixed question. Next is a finding that the defendant failed to meet his burden of proof under Strickland and that the pleas were induced by ineffective assistance of counsel. I would submit to the Court that that is comparable, again, to the ineffectiveness determination by the State court quoted at page 978 of Lambert as well. So the next finding is that the reasoning of Judge Gilroy is persuasive. There's several reasons why that determination is unreasonable, Your Honor. Several very important reasons. Number one, we know objectively that Judge Gilroy got the facts wrong in 1983. If you look at his ruling, page 1er193, and I think this part is actually quoted in the district – in the post-conviction court's ruling, he says, you know, Mr. Weaver, you got a good deal here. Mr. Chabot, your attorney, negotiated a package deal, so to speak, that subjected you to two maximum punishments on two of the charges. He had a misunderstanding as to the scope of punishment that Mr. Weaver was subject to. It was actually twice that. It wasn't just two maximum penalties. It was a combined plea agreement that subjected him to a sentence that resulted  The next mistake Judge Gilroy made. It had already been settled by the time of McMahon v. Richardson in 1970 that the lawyer's competent advice was critical to an ineffectiveness inquiry. That's certainly very explicitly the case by the 1996 decision in post-conviction. Judge Gilroy said, much of the testimony I've heard here today about the defenses and the like is irrelevant. It clearly was highly relevant. And that's the information that Judge Gilroy announced he found unimportant to his decision that Judge – that the district court found critical to its determination. That's why, again, that ruling is sound under the AEDPA. Next, Your Honor, Judge Gilroy was not privy to very important information that came after the 1983 motion to withdraw the plea. Mr. Weaver expanded his case on ineffective assistance of counsel. He brought forward Mr. Chaveau's own secretary who testified as to her personal knowledge as a percipient witness as to what she saw. Mr. Chaveau saying, I don't make enough money in this case to drive out to the jail. Specifically told his lawyer that he should not take calls, collect calls from Mr. Weaver. Told him, told his secretary that because he said he was guilty, we're not going to do any more work on the case. That information was not available to Judge Gilroy. And, therefore, it was objectively unreasonable when it came before the post-conviction court for that court to just look at Judge Gilroy's ruling that this was kind of a buyer's remorse type of determination and find that the plea was – that the reason for the plea was unreasonable or that it should be rejected. The court had to consider all of this information. And we've cited Taylor v. Maddox on the point that a court that disregards or misapprehends important information before it is rendering an unreasonable determination. For those reasons, Your Honor, the findings of fact, some of which, as I mentioned, are conclusions of law, was objectively unreasonable. Again, and I'd like to talk about the insanity defense for a moment. Judge Gilroy said that this information was just not important to him. It was very important because it supported a viable, strong defense of not guilty by reason of mental disease or defect. There were several psychologists here who significantly and strongly supported this defense. But there were several who did not and felt that there was nothing there. Your Honor, I would take issue with that. There were two psychologists who were not involved for forensic purposes who did not find the elements of the insanity defense. One of the doctors told Mr. Chabot expressly, please don't consider my evaluation as any kind of forensic evaluation. The five doctors who got involved for forensic purposes supported the defense. That in and of itself is strength. That in and of itself is an important point that should have been conveyed to the client about the potential for raising this defense. Dr. Dixon found a qualifying mental illness, the personality disorder. And I would just interrupt myself for a moment to point out that even before this case was legal point that a personality disorder is a basis, a valid basis, for an insanity defense under Oregon law. Dr. Okulich found a mental disease or defect as well, and that as a result of that, he was unable to conform his behavior to the confines of the law. Dr. Okulich, the most important psychologist here, also found a mental illness, a personality disorder, or excuse me, he found a mental disease or defect, and that he was completely unable to control his conduct. Thus, the two prongs necessary for a valid insanity defense were present in the evidence that counsel discussed with his client. What is your response to Ms. Klemstein's argument about Dr. Okulich? You heard what she said, that he felt he needed more time, et cetera. What we see from Dr. Okulich's later testimony, he then obtains the report from the state psychologists, the ones who evaluated Mr. Weaver after he pled guilty and went to the state hospital. He's asked the question, did you learn anything else since you rendered your initial opinion that informs that psychiatric judgment? He says, if anything, it has strengthened my opinion that Mr. Weaver was unable to conform his conduct to the requirements of the law. So, the evidence that he acquires after making that particular statement in his report strengthens his opinion and shows that had Mr. Chabot followed up with his doctor, it is likely that his opinion, as he mentioned, would have even gained further support. My opposing counsel has made the point that, well, it still wasn't very strong. And I would point in particular also to page 21 to 22 of their brief where they have, and this is their reply brief, and in that particular portion of their brief, they try to diminish the significance of the report from the state psychologist, which was that Mr. Weaver had a paraphernalia or a mental disease or defect and that he was unable to conform his conduct to the requirements of the law. The doctor then testified, this is Dr. McNutt, that, well, you know, in response to a question, he says, Weaver might have got a kick out of it, but he was still compelled to do it. The state takes that statement and tries to diminish the strength of this insanity defense. They say that that particular finding would not have endeared Mr. Weaver to the jury. Your Honors, that completely misunderstands the focus of an insanity defense. Endearing the defendant to the jury is not at all the purpose of the defense. In fact, in a contested insanity trial, the defense attorney is trying to prove how his or her client is, and that as a result cannot conform his conduct to the requirements of the law. Certainly in the John Hinckley case involving the attempted assassination of the president, the defense did not try and endear his client to the jury. The defense is that because this person has this severe psychiatric malady, he can't control his conduct. That was the conclusion of several psychologists and psychiatrists, including the State, who conducted examinations and evaluations of Mr. Weaver. So it is completely unreasonable to find that there was, on this record, no basis for the defense or that it was unlikely to succeed. And I would point out that the State is trying to have it both ways. In the State post-conviction court, they argued that there was no defense available and that the reports didn't rise to the level of the defense. And as I've pointed out on the final page of my chronology that's recently submitted to the court, when the case then comes to federal habeas, the State's position shifts. It's now that, well, he might have had a defense, he might not, but it was not likely to succeed. Those two positions are in conflict, and they undermine the State's request that there be deference to an alternative finding to the extent that finding was made at all. Since my time is running out, I'd like to just underscore one point. It is critical, even when a defendant voices perhaps even decent motivations concerning the effect of a trial on the victim, for the defense lawyer to provide informed, accurate information as to available defenses. We've all had the experience as defense attorneys of a client who says, yeah, I did it. I took the drugs or I took the gun. I'm guilty. If the defense lawyer doesn't present a viable defense, assuming it's supported by the record of entrapment, that's not an informed plea. The defendant still has to be told that he has available defenses, and then the attorney may elucidate upon that with information about their strengths and weaknesses. That is not what happened here. With a client who had clear questions, open questions about his options, concerns about his alternatives, this attorney failed to provide competent, minimally competent legal advice concerning the defenses available to Mr. Weaver, and I did not get to the inaccurate information pertaining to the sentence, and I will rely on my brief for that. Thank you, Your Honor. Thank you, Counsel. Ms. Plaston, you have some reserve time. It's at 18 seconds. I'll try to have a couple points here. Excuse me, Counsel. I hate to interrupt you, but I want you to respond to your opposing counsel's statement about the good deal. The district court said the state court was unreasonable in its statement that this was a good deal. How do you respond to that? I think it was a good deal. You must understand the scope and the number of trials this defendant would have to face. He would face trials, two in Clackamas County, two or three in Multnomah County. There's 23 victims in all. He was already charged in Clark County. He was his license. Clark County, Washington. Clark County, Washington. His license plate had been identified because he was chased from a scene of a burglary up there. It was a good deal in the sense of this defendant's own motivations that he didn't want to drag his family through this. He didn't want to put these victims through more pain, and that's precisely what he would have to do if he were to seek trials on all this. It's not a matter of simply the sentences that could be imposed, because, of course, at the time Judge Gilroy made those comments, no sentence had yet to be imposed. The Clackamas County. All right. And as to that motivation, Langford v. Gay is a good analogy. This is actually much stronger in the sense that rather than just Mr. Chaveau saying, he told me he didn't want to put his family through this and he just wanted to drop it all and go to, you know, plead guilty. He told that to Dr. Maracle. He told that to Dr. Dixon. He told that to Dr. Paltrow. He told that to, I think, Dr. Okulich. I may have transversed some of these doctors, but there are at least four corroborating witnesses, even the doctor who saw him on the Davis plea, that that's what his plea motivation was. As to what Mr. Chaveau told him directly at the time he advised him, I think the reference at page volume 1, 145 is actually a reference to a conversation Chaveau had to the father. They're both named Weaver. The direct conversation that he had with his client was, I think this is at 128 and 129 of the same volume. I told him, and he walks through it, that a physician would have to have a finding that he did not understand, that he did not understand or did not have the ability to conform, that there ought to be a specific problem, that he either had to not be able to understand or to conform. That's the advice given, and he did make a qualitative assessment this wouldn't hold up. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: Browning, D.W. Nelson, O'Scannlain